UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD BRECHT,

               Plaintiff,

v.

THE DAVEY TREE EXPERT COMPANY,

               Defendant.
_____/

Civil Action No. 20-cv-10786

David R. Grand[1]
United States Magistrate Judge

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 22)

In this case, plaintiff Richard Brecht ("Brecht") seeks to hold his employer, The Davey Tree Expert Company ("Davey") responsible for injuries Brecht suffered on the job when another Davey employee, Shane Frost ("Frost") attacked him. The case proceeded through discovery, and Davey now moves for summary judgment, arguing that under Michigan's Workers' Disability Compensation Act of 1969 ("WDCA"), M.C.L. § 418.101, et seq., Brecht's exclusive remedy is to apply for workers' compensation benefits – which he has successfully done.

§ 131(1) of the WDCA provides that the right to recover such benefits "shall be the employee's exclusive remedy against the employer for a personal injury or occupational disease." M.C.L. § 131(1). An exception, exists, however, where the employee's injury arose out of an "intentional tort." But the statute defines "intentional tort" in an

---

[1] On June 8, 2020, a Notice, Consent, and Reference of a Civil Action to a Magistrate Judge was filed pursuant to 28 U.S.C. § 636(c), such that the undersigned shall conduct all proceedings in this case, including trial and entry of final judgment. (ECF No. 8).

exceedingly narrow way. Under the WDCA, an "intentional tort" exists only where the employee is "injured as a result of a deliberate act of the employer and the employer specifically intended an injury." Moreover, the employer must have had "actual knowledge that an injury was certain to occur and willfully disregarded that knowledge." The statute also provides, "[t]he issue of whether an act was an intentional tort shall be a question of law for the court."

Here, Brecht failed to raise a material question of fact that he was injured by a "deliberate act" *of Davey* and that *Davey* "had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge." Accordingly, as a matter of law, an "intentional tort" as defined by the WDCA did not occur, and the Court will grant Davey's motion for summary judgment.

I. **FACTUAL AND PROCEDURAL BACKGROUND**[2]

A. *The January 27, 2019 Incident*

This case arises out of an incident which occurred on January 27, 2019, between plaintiff Brecht and Frost, both of whom were employees of defendant Davey. Brecht and Frost were working on the same tree trimming job for Davey in a subdivision. Four work crews were present, with Frost being the foreman of one crew and Brecht being a journeyman member of one of the other crews. During work that day, Brecht was directing a truck into position when it became stuck in an ice rut in one of the yards. Frost entered the yard shortly after to address the situation, and started "hollering at [Brecht] about

---

[2] The Court provides the undisputed facts and the disputed ones in a light most favorable to Brecht.

getting the truck stuck." Frost was mad at Brecht for allowing the truck to become stuck which stopped the crew from working, and Frost called Brecht "dumbass" and "idiot." Frost then physically attacked Brecht, taking him to the ground by kicking his feet out from under him. Brecht suffered a displaced mid femoral fracture, which required surgery and an eight-day hospitalization. Brecht was off work for eight months and applied for and received workers' compensation benefits during that time. Frost was charged in state court with misdemeanor assault and battery. He eventually entered a plea of no contest and was sentenced to community service, anger management, and probation.

During discovery in this case, Brecht repeatedly testified that Frost never specifically said during the incident that he was intending to hurt Brecht. Rather, Brecht testified that Frost said he "was going to kick my legs out from under me" and "put me on the ground."[3] Frost testified that he hadn't planned to get into an altercation with Brecht, and, consequently, that he never told anyone at Davey that he planned or intended to do so. Similarly, James Standlick, who was the foreman of Brecht's crew, testified that he had no information that Frost had intended to injure Brecht.[4] Frost testified that nobody at Davey

---

[3] Brecht did, in response to one question, say "I take that back because he said he was going to put me on the ground. That's hurting me right there." But that answer was non-responsive to the question, which was, "He *never said* he was going to intentionally hurt you, correct?" The very next question put to Brecht was, "he never specifically said he was going to injure or hurt you, correct?," and Brecht unequivocally answered, "Correct."

[4] When Standlick was asked whether he had any such information, Brecht's attorney objected, claiming the question "calls for speculation." This objection lacks merit; Standlick could have had such information if, for example, Frost had called him the morning of the incident and told him that he was going to hurt Brecht. It is also emblematic of the central flaw in Brecht's case. Brecht's intentional tort claim rests on the argument that *Frost's* kicks were the "deliberate act" engaged in by *Davey*. As explained below, however, under the facts of this case, Brecht's conduct cannot be imputed to Davey.

3

instructed him to have the altercation with Brecht or that getting into such an altercation was encouraged or permitted.

Frost was not supervising Brecht's general work on the day in question, but Brecht contends that given Frost's foreman position, in any interaction between them at a worksite, Frost would be considered his supervisor. A Davey "area manager," Clay Carlson, testified that generally, "when crews are working together or assigned the same job site, there's a job briefing that occurs in the morning . . . where the foremen will get together and assign job tasks to the crew members. And so they essentially co-manage the entire crew." However, Carlson did not testify as to any specific division of labor on the day in question.

    B. *Additional Background Facts*

Frost testified that his responsibilities for Davey did not involve, hiring, firing, or disciplining employees. He testified that his training was limited to "proper tree techniques," and did not include working with or managing employees. He also testified that his job duties did not involve horseplay or fighting with other employees, and that his interaction with Brecht during the incident in question was also not part of his job duties for Davey.

Frost had worked a separate stint for Davey dating back to the early 1990s, then bounced between multiple union companies over the years. One of them fired Frost in September 2008 after Frost "sucker punched" a co-worker while allegedly attempting to break up a fight between that co-worker and another one. Frost testified that when Davey re-hired him in December 2010 it was aware of this prior incident. Brecht testified that he had "reported to" Frost 500 times prior to the incident in question, and that on five

4

occasions, Brecht had complained to Davey management about Frost, letting them know Frost was "an accident waiting to happen," that he couldn't work with Frost, and that Davey "need[s] to get rid of him." However, Brecht testified that he did not provide Davey any specific details regarding why he believed Frost was "an accident waiting to happen." Brecht also testified that he didn't put his complaints in writing or file a grievance related to Frost. When asked what he told Davey about being unable to work with Frost, Brecht testified, "He's just a bad person to work for. He treats me bad." Similarly, when asked what he told Davey about why it should "get rid of" Frost, Brecht testified, "He's an accident waiting to happen; he's a bad person, and you can't be putting people around him because he just – something's going to happen and he just – he's just not a good person to work for. He shouldn't be a foreman." Frost remained employed with Davey until his termination later in the day of the incident with Brecht.[5]

### C. The Instant Action and Davey's Motion for Summary Judgment

On March 26, 2020, Brecht commenced this action against Davey, asserting a single count of "Intentional Tort." Brecht contends that Davey "is responsible for the intentional act of its foreman [Frost] pursuant to the statutory exception to the exclusive remedy of the Michigan Workers' Disability Compensation Act MCL §418.131." Following the completion of discovery, Davey filed a motion for summary judgment. (ECF No. 22). Davey first argues that this Court lacks subject matter jurisdiction over Brecht's intentional

---

[5] The reasons for Frost's termination are unclear. However, it is undisputed that following his altercation with Brecht, Davey subjected Frost to a drug test and that Frost tested positive for marijuana.

tort claim. Separately, Davey argues that M.C.L. 418.131(1)'s intentional tort exception does not apply to Brecht's claim, and that, at least as to Davey[6], Brecht's exclusive remedy is the workers' compensation benefits he has received. Brecht filed a response, and Davey filed a reply. (ECF Nos. 24, 26). The Court heard oral argument on September 20, 2021. For the reasons stated below, the Court will grant Davey's motion.

## II.  LEGAL STANDARDS

Pursuant to Rule 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children and Family Servs.,* 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether an issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and must identify portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex v. Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth

---

[6] Brecht did not name Frost as a defendant in this case, and the Court will not address any claims Frost may have against him, whether under the statute or otherwise.

6

specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleading, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (quoting *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989)). Indeed, "[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.'" *Id*. (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)). "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* at 560 (citing *Lewis v. Philip Morris, Inc.,* 355 F.3d 515, 533 (6th Cir. 2004)).

### III. <u>ANALYSIS</u>

M.C.L. § 418.101(1) provides that "[a]n employee, who receives a personal injury arising out of and in the course of employment by an employer who is subject to this act at the time of the injury, shall be paid compensation as provided in [the WDCA]." In turn, subsection 131(1) of the WDCA "indicates that an employee's exclusive remedy for a personal injury or occupational disease is the recovery permitted under the Workers' Disability Compensation Act.[7] The one exception to this recovery scheme is when an

---

[7] As the Michigan Court of Appeals has explained, under the WDCA, employees are provided nearly automatic compensation for injuries sustained on the job without regard to who is at fault for the injuries. *Sanchez v. Eagle Alloy, Inc*, 254 Mich. App 651, 659 (2003) (citing M.C.L. § 418.301(1)). In exchange, employees are limited to benefits payable under the WDCA as their

7

employer commits an intentional tort." *Travis v. Dreis and Krump Mfg. Co.*, 453 Mich 149, 551 NW 2d 132 (1996). But the WDCA employs a very narrow and circumscribed definition of "intentional tort." Subsection 131(1) of the WDCA states, in pertinent part:

> The right to the recovery of benefits as provided in this act shall be the employee's exclusive remedy against the employer for a personal injury or occupational disease. The only exception to this exclusive remedy is an intentional tort. ***An intentional tort shall exist only when*** an employee is injured as a result of ***a deliberate act of the employer*** and ***the employer specifically intended an injury***. An employer shall be deemed to have intended to injure if the ***employer had actual knowledge*** that an ***injury was certain to occur*** and ***willfully disregarded that knowledge***. The issue of whether an act was an intentional tort shall be a question of law for the court. This subsection shall not enlarge or reduce rights under law.

M.C.L. § 418.131(1) (emphasis added).

### A. The Court Has Subject Matter Jurisdiction

Davey argues that this Court lacks subject matter jurisdiction over Brecht's intentional tort claim because Brecht's exclusive remedy is for workers' compensation benefits under the WDCA. That argument lacks merit. In his complaint, Brecht alleges that he and Davey are citizens of different states – Brecht being a citizen of Michigan, and Davey being a citizen of Ohio – and that the amount in controversy exceeds $75,000. Accordingly, he satisfied the elements of this Court's diversity jurisdiction. 28 U.S.C. § 1332. Moreover, since the Court could not determine whether the WDCA's intentional tort exception applies without examining the matter on its merits, it would make no sense

---

exclusive remedy for such injuries and may not generally bring a tort action against their employers. *Id.*, (citing M.C.L. § 418 .131).

to say the Court lacks subject matter jurisdiction over the claim. *See e.g., Pearce v. Werner Enterprises, Inc.*, 116 F. Supp. 3d 948, 953 (D. Neb. 2015) ("Even if [plaintiff's] claims are ultimately determined to fall under the exclusive provisions of the [Nebraska Workers' Compensation] Act, that will not affect this Court's subject matter jurisdiction.") (citing *Cincinnati Indem. Co. v. A & K Const. Co.*, 542 F.3d 623, 624 (8th Cir.2008)).

> B. Brecht Failed to Raise a Material Question of Fact that He was Injured by "a Deliberate Act" of Davey

In general, under the WDCA, Brecht's exclusive remedy against Davey for the injury he suffered while at work was to pursue workers' compensation benefits, which he successfully did. Brecht argues, however, that the WDCA's "intentional tort" exception applies to his case such that he can pursue damages against Davey. For Brecht to invoke that exception, he must first show that he was "injured as a result of a deliberate act ***of the employer*** and the employer specifically intended an injury." M.C.L. § 131(1) (emphasis added). Even construing the facts in the light most favorable to Brecht, his claim fails as a matter of law because ***Davey*** – not Frost – was Brecht's employer, and ***Davey*** did not commit a "deliberate act" that injured him, Frost did. Indeed, the only "deliberate acts" identified by Brecht are the kicks applied ***by Frost***, and that conduct cannot be imputed to Davey. (ECF No. 24, PageID.236) ("Frost's continuous and persistent determination to trip/leg sweep/kick Brecht to the ground was a *deliberate act* of *commission* consisting of a 'true intentional tort[.]'" (emphasis in original); *id.*, PageID.237 (referencing standard of proof for intent behind "Frost's deliberate act of tripping [] Brecht . . .")).

9

> Section 151 of the WDCA provides, in pertinent part:
>
>> The following constitutes employers subject to this act:
>>
>> * * *
>>
>> (b) Every person, firm, limited liability company, limited liability partnership, and private corporation, including any public service corporation, who has any person in service under any contract of hire, express or implied, oral or written, unless those employees excluded according to the provisions of section 161(5) comprise all of the employees of the person, firm, limited liability company, limited liability partnership, or corporation.

M.C.L. § 418.131(1).

There is no evidence in the record that Frost had any sort of contractual relationship with Brecht in terms of their work for Davey. Accordingly, under the statute's plain language, Frost was not Brecht's "employer." Brecht doesn't assert otherwise, but argues that because Frost was a supervisory employee of Davey, with at least some responsibility over Brecht, Frost should either be deemed to be Brecht's "employer" or have his actions imputed to Davey. Specifically, Brecht argues, "Shane Frost is a *Supervisory or Managerial* employee of Brecht's employer, Davey Tree. *Travis*, [173]. As Foreman, Frost exercised supervisory authority over Brecht at the common worksite." (ECF No. 24, PageID.235) (emphasis in original).

As shown by this quote, Brecht's argument stems from the *Travis* Court's discussion of § 418.131(1)'s "actual knowledge" requirement, where it wrote, "[a] plaintiff may establish a corporate employer's actual knowledge by showing that a supervisory or managerial employee had actual knowledge that an injury would follow from what the employer deliberately did or did not do." *Travis*, 453 Mich. at 173-74. But careful

10

examination shows that Brecht's argument fails to properly consider the most fundamental aspect of the vicarious liability analysis; whether Frost's conduct was outside the scope of his employment. In Michigan, "liability cannot be imposed against an employer for torts intentionally committed by an employee that are outside the scope of the employment." *Salinas v. Genesys Health System*, 263 Mich. App. 315 (2004). *See also Rogers v. J.B. Hunt Transport, Inc.*, 466 Mich. 645, 651 (2002) ("An employer is not vicariously liable for acts committed by its employees outside the scope of employment, because the employee is not acting for the employer or under the employer's control.").[8]

Before the Court delves more deeply into *Travis* one prefatory note helps to perhaps explain Brecht's confusion; the *Travis* Court didn't directly address the "scope of employment" issue – presumably because it was not in dispute in that case. In *Travis*, the plaintiff Aimee Sue Travis was employed by Greenville Wire Products Co. ("GWP"). After working for GWP for seven months, Travis was assigned to operate a press brake equipped with a die that formed refrigerator wires. Travis' supervisor, William Clarke, showed Travis how to operate the press, and instructed her that she was to place the wires into the die with her hands, push the palm buttons to cycle the press, then reach into the die space to remove the wires after they had been formed. The press was designed not to run unless the operator's hands were on the palm buttons.

After Travis operated the press for about an hour, it "double cycled," that is, it cycled without Travis pressing the palm buttons. Travis' hands were in the press when it double

---

[8] Brecht contends he "never pled any claim based upon vicarious liability," yet in seeking to impute Frost's conduct to Davey, that is precisely the nature of his claim. (ECF No. 24, PageID.227).

11

cycled, and it came down on them, causing her serious injuries. Travis was unaware that the press had been malfunctioning for about a month. Clarke, however, did know this fact, as other employees reported press malfunctions to him. Those employees had been able to identify the "double cycles" before they occurred, and thus remove their hands in time to avoid injury. Clarke believed this was because the press cycled slowly. The day before Travis' injury, another employee had refused to run the press because it had been double-cycling again. A tool room supervisor reported this to Clarke and advised him to shut the press down so it could be repaired. But Clarke refused to do so because he believed the repair process would take too long.

Travis sued GWP and others. GWP moved for summary disposition, arguing that under the WDCA, Travis' exclusive remedy was workers' compensation benefits. The trial court granted summary disposition to GWP, finding that Travis failed to allege facts showing that GWP had the requisite specific intent, or that it knew an injury was certain to occur and willfully disregarded that knowledge. The Michigan Court of Appeals reversed, finding that Travis' allegations were enough to invoke § 131(1)'s "intentional tort" exception. The Michigan Supreme Court reversed the Court of Appeals, finding that Travis could not show her injury was certain to occur.

Before reaching the "certain to occur" issue, however, the Court provided the verbiage on which Brecht relies. *See supra* at 10. Specifically, in its brief discussion of § 131(1)'s "actual knowledge" requirement, the Court wrote, "[a] plaintiff may establish a corporate employer's actual knowledge by showing that a supervisory or managerial employee had actual knowledge that an injury would follow from what the employer

12

deliberately did or did not do." *Id.*, at 173–74. When it applied that principle to the facts alleged by Travis, the Court wrote:

> [GWP], through its supervisory employee Clarke had actual knowledge that the press was malfunctioning. On the morning of plaintiff's accident, [] the tool room supervisor, informed Clarke that the machine was double cycling and should be shut down in order to repair it. Clarke refused to shut down the machine. Because a supervisory employee was made aware of the malfunctioning press, we conclude plaintiff has established the actual-knowledge prong.

*Id.*, at 181.

Because the *Travis* Court commenced its analysis with the "actual knowledge" prong, it never specifically identified the "deliberate act of the employer" that gave rise to GWP's potential liability. But a fair reading of the decision makes it clear that the Court considered the "deliberate act" to be Clarke's "refus[al] to shut down the machine." The Court had gone to great lengths to discuss exactly how Clarke had trained and supervised Travis and others with respect to the press, and how he was responsible for determining whether to continue to operate it. Since the Court hadn't specifically identified the "deliberate act" that Clarke had committed, it also didn't specifically address whether that act was within the scope of Clarke's employment. But again, that was not in dispute in the *Travis* case because all of Clarke's conduct, including his refusal to shut the press down, was clearly within the scope of his employment for GWP.

The instant case is distinguishable because Frost's assault against Brecht was not within the scope of his employment. Michigan courts look to the Second Restatement of Agency, 2d, § 228, p. 504, for "a useful outline" when determining whether an employee's

13

conduct falls within the scope of his employment. *Matouk v. Michigan Mun. League Liab. & Prop. Pool*, 320 Mich. App. 402, 414 (2017). That section of the Restatement provides:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
> (a) it is of the kind he is employed to perform;
>
> (b) it occurs substantially within the authorized time and space limits;
>
> (c) it is actuated, at least in part, by a purpose to serve the master, and
>
> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

Second Restatement of Agency, 2d, § 228, p. 504.

Moreover, "[c]onduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Matouk*, 320 Mich. App. at 414.

Applying the above principles to this case makes clear that Frost was not acting "within the scope" of his employment when he assaulted Brecht. Even if Frost's conduct can be construed as "discipline" of a subordinate employee which would satisfy prongs (b) and (c) of the Restatement, the record evidence establishes that kicking his co-worker in the legs was not conduct "of the kind he [was] employed to perform" or which was "expected" by Davey. Frost testified that his job duties did not involve horseplay, wrestling, or fighting with other employees. He testified that his duties also did not involve physical abuse or punishment of other employees, and that Davey did not "authorize" or "instruct" him to engage in the physical interaction with Brecht. Finally Frost testified that

14

nobody at Davey ever trained or encouraged him to engage in that type of conduct, or told him it was permitted. Brecht presented no evidence contradicting Frost's testimony on these points. Instead, he argues that "Foreman Frost was acting in furtherance of Davey Tree's interest at the time he intentionally injured Brecht. Frost testified that he was helping tow Foreman Standlick's bucket truck from the ice at the time of the incident." (ECF No. 24, PageID.235). The problem with Brecht's argument is that he wasn't injured by Frost's actions in towing the bucket truck. Rather, Brecht asserts that the "deliberate act" that caused his injuries was Frost's physical assault, *see supra* at 9, and again, the undisputed evidence is that such conduct was not within Frost's scope of employment. Brecht also claims, "[o]bviously, Frost was acting out his frustration over the work stoppage and not to gratify any personal animosity." (ECF No. 24, PageID.236). But Frost presents no evidence to support this "obvious" motivation, and at any rate, it would not change any of the above analysis as to why a physical assault by Frost was not within the scope of his work for Davey. Thus, prongs (a) and (d) of the Restatement are not satisfied and Frost's conduct was "different in kind from that authorized" by Davey. *Matouk*, 320 Mich. App. at 414.

In sum, while Frost may have engaged in "a deliberate act" that injured Brecht, that conduct was not within the scope of his employment and cannot be attributed to Davey. Thus, Brecht cannot satisfy the *sin qua non* for invoking the WDCA's intentional tort exception – a "deliberate act of the employer" that injured him. M.C.L. 418.131(1).

The most analogous cases the Court could find support the above analysis. One example is *Francois v. Butterball Farms, Inc.*, No. 248356, 2004 WL 2726141 (Mich. Ct.

15

App. Nov. 30, 2004). In that case, the plaintiff was a Haitian immigrant employed as a "production employee" by Butterball Farms, Inc. The plaintiff's job required him to be clean shaven, and when he arrived at work one day with facial hair, his immediate supervisor ordered him to go home to shave, after which he could return. Plaintiff became hostile, so that supervisor requested assistance from another supervisor, "processing team leader" Louis Sanders, who calmed the plaintiff down and instructed him to "go home to shave." According to the plaintiff, Sanders then followed him into a locker room and attacked him, causing him to suffer serious injuries. The plaintiff sued Butterball Farms and Sanders, alleging, among other claims, "intentional tort-assault and battery-per MCL 418.131(1)." Butterball obtained leave to appeal the trial court's denial of its summary disposition motion. On appeal, the Michigan Court of Appeals reversed, holding, "[e]ven assuming the alleged assault occurred as plaintiff described it, there is no factual support for the argument that ***defendant [Butterball]*** authorized it or even knew it was going to occur." *Francois*, 2004 WL 2726141, at \*4 (emphasis added).

Another example is the case of *Martinez v. L & G Indus. Prod., Inc.*, No. 228818, 2002 WL 1275696, at \*2 (Mich. Ct. App. June 4, 2002). In that case, the plaintiff, Juanita Martinez, worked at a company, L & G Industrial Products, Inc. ("L&G"). L&G's plant manager was Shirley Thomas. Martinez alleged that Thomas assaulted her one day at work, and that Thomas' actions constituted an intentional tort within the meaning of § 131(1). Martinez' argument appears to be the same as Brecht's is here; that in light of the intentional nature of Thomas' conduct and her managerial position, Thomas' assault could be imputed to L & G. The Michigan Court of Appeals rejected that argument, however,

16

explaining, "[Martinez] and Thomas engaged in a physical altercation in the workplace. No evidence established that ***L & G acted*** with the specific intent to injure plaintiff, or that ***L & G had actual knowledge*** that an injury was certain to occur, and willfully disregarded that knowledge. [] Thomas's knowledge cannot automatically be imputed to L & G." *Martinez*, 2002 WL 1275696, at *2 (emphasis added).

Again, these cases show that merely because a supervisor assaults a subordinate employee while at work does not mean the *employer* engaged in *any* conduct, much less the "deliberate act" necessary to meet the first prong of the WDCA's intentional tort exception.

In sum, Brecht failed to raise a material question of fact that Davey engaged in a "deliberate act" that injured him. This alone is a sufficient basis to grant summary judgment in Davey's favor on Brecht's intentional tort claim.

> C. *Brecht Failed to Raise a Material Question of Fact that Davey Had "Actual Knowledge" that an Injury was Certain to Occur*

Brecht also failed to raise a material question of fact that Davey had "actual knowledge" that an injury was certain to occur. As discussed above, both *Francois* and *Martinez* specifically found that absent the *employer's* advance knowledge that the assaultive conduct was going to occur, the employee could not meet the exception's "actual knowledge" prong. *Francois*, 2004 WL 2726141, at *4; *Martinez*, 2002 WL 1275696, at *2. On the "actual knowledge" prong of the intentional tort exception, Davey presented the testimony of Frost, who denied telling anyone at Davey that he intended to assault or injure Frost. Davey also presented Standlick's testimony that he had no information that

17

Frost had intended to injure Brecht. Brecht did not present any evidence refuting either Frost's or Standlick's testimony. Instead, he points to the fact that when Davey re-hired Frost in 2010, it knew he had "sucker punched" a co-worker about two years earlier. But Brecht is not asserting a negligent hiring claim, and Frost's prior conduct is far too remote in time to have given Davey "actual knowledge" that he was going to assault Brecht in 2019. Nor could it have apprised Davey that Brecht's injury was "certain to occur." Similarly, while Brecht complained about Frost to Davey management on five occasions prior to their altercation, Brecht admits he did not provide any details, and instead merely made vague statements like Frost was "an accident waiting to happen" and that he was "a bad person to work for." Even taken collectively, none of Brecht's evidence raises a material question of fact that Davey had actual knowledge Frost was going to injure him. This provides another basis for granting Davey's motion for summary judgment on Brecht's intentional tort claim.

### IV.  CONCLUSION

For the reasons set forth above, Brecht's intentional tort claim against Davey fails as a matter of law. Accordingly, **IT IS ORDERED** that Davey's motion for summary judgment (**ECF No. 22**) is **GRANTED**, and that this case is **DISMISSED**.

Dated: January 6, 2022                                 s/David R. Grand
Ann Arbor, Michigan                            DAVID R. GRAND
                                                               United States Magistrate Judge

## CERTIFICATE OF SERVICE

      The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 6, 2022.

                                              s/Eddrey O. Butts_____
                                              EDDREY O. BUTTS
                                              Case Manager